**[Cite as *Artex Minerals, L.L.C. v. Foraker*, 2026-Ohio-2732.]**

IN THE OHIO COURT OF APPEALS
FIFTH APPELLATE DISTRICT
GUERNSEY COUNTY, OHIO

| | |
|---|---|
| ARTEX MINERALS LLC, | Case No. 25CA000044 |
| Plaintiff - Appellant | <u>Opinion & Judgment Entry</u> |
| -vs- | Appeal from the Court of Common Pleas of Guernsey County, |
| ROBERT T. FORAKER, et al., | Case No. 24CV000331 |
| Defendants - Appellees | Judgment: Reversed and remanded |
| | Date of Judgment: July 16, 2026 |

BEFORE: Andrew J. King, Kevin W. Popham, and David M. Gormley, Judges

APPEARANCES: Daniel P. Corcoran (Theisen Brock), Marietta, Ohio, for Plaintiff-Appellant; Matthew W. Onest and David C. Hofsess (Krugliak, Wilkins, Griffiths & Dougherty), Canfield, Ohio, for Defendants-Appellees.

*Gormley, J.*

{¶1} Plaintiff Artex Minerals LLC challenges a trial-court decision granting summary judgment in favor of defendants Robert and Kathleen Foraker. In 2023, Artex acquired certain underground mineral rights from the purported owner of those rights beneath 43 acres of land in Guernsey County. More than 10 years earlier, though, the Forakers — who are the current owners of the surface rights to the land — had invoked the "abandonment" process spelled out in R.C. 5301.56 (Ohio's Dormant Mineral Act) to acquire, they say, the mineral rights beneath their land from the entity who later sold those same rights to Artex.

{¶2} So, who now owns the underground mineral rights, and can Artex challenge the Forakers' claim that they, rather than Artex, own those rights ?

{¶3}   The trial court sided with the Forakers, citing several undisputed facts: (1) the Forakers in 2011 published a newspaper notice describing their intent to acquire, through the statutory abandonment process, the underground mineral rights beneath their land, (2) the Forakers then filed in the county recorder's office an affidavit stating that they had acquired those underground mineral rights through the abandonment process, and (3) the Forakers also had the county recorder add in 2012 a handwritten notation to the recorder's copy of the 1944 deed in which the surface rights and the underground mineral rights had first been severed, and that so-called marginal notation on the official copy of the deed in the county recorder's office indicated that the mineral rights described in that deed had been abandoned in 2011.

{¶4}   In the trial court's view, Artex in 2023 could and should have seen the Forakers' 2012 marginal notation on the recorded deed when Artex sought to acquire the underground mineral rights from a company called Kingston Oil Corporation, who was the purported owner of those rights.  That marginal notation should have alerted Artex in 2023 that the Forakers — rather than Kingston Oil — were by then the apparent owners of the underground mineral rights, according to the trial court.  Under Ohio's Dormant Mineral Act, Artex, in the trial court's view, has no standing now to challenge the Forakers' claim of ownership of those mineral rights.

{¶5}   But the Forakers, according to Artex, failed in 2011 to give to Kingston Oil — the then-owner of the underground mineral rights — the requisite notice required by the Dormant Mineral Act, so the Forakers, in Artex's view, never actually acquired through the abandonment process the mineral rights that the Forakers now claim to own.

{¶6}    For the reasons explained below, we reverse the summary judgment that the trial court granted in the Forakers' favor.  Whether the Forakers' purported acquisition of the mineral rights through the abandonment process comported with the Dormant Mineral Act is a question that the trial court did not decide and that the present record does not answer.

{¶7}    An answer to that question matters.  If the Forakers failed to comply with R.C. 5301.56's notice requirement in 2011, then their purported acquisition of the mineral rights through the abandonment process did not divest Kingston Oil of its ownership interest in the mineral rights, and we believe that Kingston — as well as any person or entity, such as Artex, who is a subsequent purchaser of those mineral rights — can challenge the purported abandonment now.

**The Key Facts**

{¶8}    In 1944, Robert and Ena Martin severed the surface rights from the underground-mineral rights on their 43-acre parcel in Guernsey County, selling to a new owner all of the surface rights but retaining for themselves an undivided 80% interest in the underground minerals.  After a series of conveyances and corporate consolidations in the ensuing decades — all of which were properly recorded and indexed in either the county recorder's office or the Ohio Secretary of State's office — that 80% interest in the underground minerals ended up in the hands of an entity known as Kingston Oil Corporation.  Then in 2023, Kingston conveyed all of its Ohio oil and gas assets — including the 80% interest in question — to Artex.

{¶9}    As for the surface rights and the remaining 20% interest in the underground minerals, those eventually ended up in the hands of the Forakers in the year 2003.  And in 2011, the Forakers turned to Ohio's Dormant Mineral Act in R.C. 5301.56 to try to acquire

the 80% interest that was then held by Kingston. As part of that statutory abandonment process, the Forakers published a newspaper notice about their plans, with that notice directed to "Robert H. Martin and Ena Martin, or if deceased, their unknown heirs." Then weeks later, the Forakers recorded with the county recorder an affidavit of abandonment that described the mineral rights in question, and they also in 2012 had the county recorder add a marginal notation to the recorder's copy of the Martins' 1944 deed in which the surface rights and mineral rights had first been severed, with that marginal notation indicting that the 80% mineral-rights interest described in that 1944 deed had been abandoned in 2011.

{¶10} What is unclear from the record before us is whether, before publishing the abandonment notice in a local newspaper in 2011, the Forakers had conducted any sort of search to identify and locate Kingston as the then-current holder of the 80% mineral-rights interest, and we also do not know whether the Forakers tried to serve, whether by certified mail or otherwise, any notice to Kingston about the Forakers' plans to acquire the mineral rights by claiming that those rights had been "abandoned" as that term is used in R.C. 5301.56(B).

{¶11} In 2024, Artex sued the Forakers and asked the trial court to determine who owns the 80% mineral-rights interest. After the parties each filed summary-judgment motions, the trial court sided with the Forakers, finding that Artex lacks standing to challenge the Forakers' ownership claim.

**The Standard of Review**

{¶12} We review with fresh eyes a trial court's decision to grant summary judgment. *McCord v. Ron Laymon Trucking Co.*, 2005-Ohio-4399, ¶ 19 (5th Dist.). Summary judgment is proper only where no material facts are genuinely in dispute, where the moving party is

entitled to judgment as a matter of law, and where reasonable minds, viewing the evidence most strongly against the movant, can reach but one conclusion, with that conclusion being adverse to the non-moving party. *Id.* at ¶ 22; Civ.R. 56(C).

{¶13} Standing to sue is the requirement that a litigant must have a real stake in the dispute and must allege a concrete injury that is both traceable to a defendant's conduct and redressable by a court. *Moore v. Middletown*, 2012-Ohio-3897, ¶ 21–22. Whether established facts confer standing to sue is a question of law, which we examine without deference to the trial court's view. *Portage Cty. Bd. of Commrs. v. Akron*, 2006-Ohio-954, ¶ 90.

**What Earlier Cases Have Resolved: The Owner of Surface Rights in Land Who Tries to Use the Abandonment Process to Acquire Underground-Mineral Rights Beneath that Land Must Comply with the Notice Requirement in R.C. 5301.56(E)**

{¶14} Several court decisions — including a key one from the Supreme Court of Ohio — have settled an important issue surrounding the Dormant Mineral Act, and those decisions emphasize the importance of a surface owner's compliance with the Act's notice requirement.

{¶15} The language of R.C. 5301.56(B) tells us that a severed mineral interest is "deemed abandoned and vested in the owner of the surface of the lands subject to the interest" only "if the [notice] requirements established in division (E) of this section are satisfied" (and also if no statutory saving circumstance — such as actual mineral production at the site within the preceding 20 years — applies). Compliance with division (E)'s notice requirement is thus a "condition precedent" to acquiring mineral rights through abandonment. *Fonzi v. Brown*, 2022-Ohio-901, ¶ 15. That requirement includes the surface owner's obligation to exercise what the Supreme Court has described as "reasonable diligence" to identify and locate the holders of the interest before resorting to notice by publication. *Id.* at ¶ 21, applying *Gerrity v. Chervenak*, 2020-Ohio-6705, ¶ 41. And the surface owner bears the burden of proving that he

or she complied with that reasonable-diligence standard, including in any "subsequent action challenging a surface owner's compliance with the [Act]'s notification requirements." *Fonzi* at ¶ 23.

{¶16} When a surface owner fails to satisfy those requirements, that failure "precludes application of the Dormant Mineral Act." *Beckett v. Rosza*, 2021-Ohio-4298, ¶ 25 (7th Dist.). *See also Fonzi* at ¶ 21 ("a surface owner" who fails to comply with the notice requirement in R.C. 5301.56(B) "is not entitled" to acquire through the abandonment process the mineral rights under the surface). The interest, in that event, "cannot be deemed abandoned and instead remains with the mineral-interest holder." *Albanese v. Batman*, 2016-Ohio-5814, ¶ 21. *See also id.* at ¶ 22 (because the notice and affidavit requirements are mandatory, a surface owner who fails to meet them acquires nothing: the mineral rights "never vest[]" in the surface owner but instead "remain" with the holder); *Blackstone v. Moore*, 2017-Ohio-5704, ¶ 17 (7th Dist.) ("any attempt to declare mineral interests abandoned . . . must comply with the notice requirements" of the Act).

{¶17} It follows that any effort by a surface-rights owner to acquire underground-mineral rights through the abandonment process is a nonstarter unless the notice requirement has been met. Any recorded affidavit or marginal notation on a deed in those circumstances would not change that result, and those recordings would represent at best a cloud on the mineral-rights owner's — the holder's — title to those rights rather than a reflection of a valid conveyance of the mineral rights to the surface-rights owner. *See Corban v. Chesapeake Exploration, L.L.C.*, 2016-Ohio-5796, ¶ 29 (plurality opinion) (explaining that the Act vests abandoned mineral rights in the hands of a new owner "if the [notice] requirements established in division (E)" of the statute "are satisfied") (quotations omitted).

**What We Resolve Today: Both the Holder and Any Successors of the Holder of Underground-Mineral Rights Have Standing to Challenge a Purported Abandonment That Arguably Did Not Comply with R.C. 5301.56(E)'s Notice Requirement**

{¶18} When a surface-rights owner has purportedly acquired mineral rights through the statutory abandonment process, who may challenge that abandonment: only the person who held the mineral interest at the time of the attempted abandonment, or also a later owner who acquires that interest from the holder ?  The trial court took the narrower view, concluding that only Kingston — the holder in 2011 — could have challenged the Forakers' abandonment, and that Artex, who acquired Kingston's interest in 2023, could not.  After examining the statute, we reach the opposite conclusion.

{¶19} R.C. 5301.56(A)(1) defines "holder" of a mineral interest as not only the "record holder of a mineral interest" but also "any person who derives the person's rights from, or has a common source with, the record holder."  As the Seventh District has explained, "[a] person who derives her rights from the record holder is herself a holder under the plain terms of the statute." *Jefferis Real Estate Oil & Gas Holdings, LLC v. Schaffner Law Offices, L.P.A.*, 2018-Ohio-3733, ¶ 31 (7th Dist.).

{¶20} And notably, the Act, in R.C. 5301.56(H)(1), extends not only to "a holder" but also to "a holder's successors or assignees" the right, for a set period of time, to challenge a claim that the holder's mineral rights have been abandoned.  *See also Jefferis* at ¶ 30 ("A timely post-notice-of-abandonment claim to . . . thwart [the] abandonment . . . can be filed by a holder [and] . . . also . . . by a holder's successor or a holder's assignee").

{¶21} Our reading of the statute, then, leads us to conclude that the right to challenge a surface-rights owner's claim that he or she has acquired underground-mineral rights through the abandonment process extends not only to the holder of the mineral rights purportedly

taken through that abandonment process but also to those who later acquire that underground-mineral interest from the purported owner of it. We see nothing in the Act that would allow only Kingston Oil to challenge the Forakers' 2011 effort to acquire Kingston's mineral-rights interest.

{¶22} And once Kingston had purportedly sold its interest to Artex in 2023, Artex had a real stake in any dispute over ownership of the underground minerals. Any challenge to the Forakers' compliance with the Act's notice requirement extends not only to Kingston Oil as the original holder of the underground-mineral rights but also — in the words of R.C. 5301.56(H) — to any of Kingston's "successors or assignees," like Artex, who have purportedly acquired those rights. Because the trial court improperly, in our view, cut off Artex's right to challenge the Forakers' 2011 compliance with the notice requirement, we now reverse the trial court's grant of summary judgment in the Forakers' favor.

{¶23} On remand, the Forakers, as the surface-rights owners, bear the burden of proving that they complied with R.C. 5301.56(E), and that means showing that they exercised reasonable diligence to identify and locate the mineral-rights holder before resorting to notice by publication. *Fonzi*, 2022-Ohio-901, at ¶ 23. The present record does not establish whether the Forakers in 2011 searched for or attempted to serve Kingston, which was the then-holder of the underground-mineral rights.

**What Remains to be Resolved in This or Some Future Case: What Time Limits, if Any, Apply to Abandonment Challenges ?**

{¶24} Not before us today are some time-related uncertainties posed by the Dormant Mineral Act. Whether this is the case for resolving those uncertainties is a question we leave for another day, but we note the uncertainties because, though standing is not, in our view, an impediment for Artex, delay by a successor in interest like Artex could limit the ability of

such a successor to challenge an abandonment, even where the surface-rights owner has fallen short in giving notice to the mineral-rights holder.

{¶25} One time limit that appears in the Act is the 60-day period mentioned in R.C. 5301.56(H). Under that provision, the holder of underground-mineral rights that a surface-rights owner is seeking to acquire through the abandonment process is given 60 days from the date on which "the notice was served or published" to take steps to preserve the underground-mineral interest. Does that 60-day time limit serve as a firm cutoff date after which the holder of the mineral rights (and any successor of that holder) loses any right to challenge the validity of the abandonment process, even where the surface-rights owner has not complied with the R.C. 5301.56(E) notice requirement ? And should a holder of mineral rights (and any successors of that holder) be bound by that 60-day time limit where the surface-rights owner has failed to comply with the *Fonzi* decision's reasonable-diligence standard for notifying the mineral-rights holder about the abandonment effort ? Those questions might be ones that the parties will want the trial court to address, but they are not questions that the parties have briefed or argued for us now.

{¶26} We find ourselves wondering, too, whether, even if the 60-day limit does not apply to situations where a surface-rights owner has fallen short in complying with the R.C. 5301.56(E) notice requirement, a limitations period of some sort — whether statutory or constitutional or perhaps based on equitable doctrines such as estoppel or laches — exists or ought to be recognized that would eventually cut off the ability of a mineral-rights holder (or successor) to come back years later to challenge the validity of a purported abandonment. We flag the question because language in paragraph 15 of the Supreme Court's *Fonzi* decision — where the Court held that "[c]ompliance with" R.C. 5301.56(E)'s notice requirement is a

"condition precedent" to a surface-rights owner's effort to acquire mineral interests through abandonment — could open the door to the filing of an abandonment-related legal challenge by a mineral-rights holder (or by that holder's successors) many decades after a surface-rights owner purports to acquire mineral rights through the abandonment process. *See* Alexander McElroy, *Ohio's Dormant Mineral Act: Current and Unresolved Issues*, 44 Cap.U.L.Rev. 325, 355 (2016) (noting that the Dormant Mineral Act sets no limitations period for a challenge to a defective abandonment).

{¶27} As the Supreme Court has explained, the Dormant Mineral Act provides a mechanism "to facilitate the reunification of abandoned mineral interests with surface interests," and it "promote[s] the use of . . . mineral rights for development and production." *West v. Bode*, 2020-Ohio-5473, ¶ 21 (citation and quotations omitted). Toward that end, the Act enables a surface-rights owner to reclaim a severed mineral interest without having to file a lawsuit, and the Act's provisions call for notice to be given to the mineral-rights holder and directs that a public record of the abandonment be created so that third parties may, in the decades that follow, rely on what that record shows. *Id*. at ¶ 38.

{¶28} But what if, perhaps 100 years after a surface-rights owner has purportedly acquired some underground-mineral rights through the abandonment process, the successor in interest to a past holder of those mineral rights comes forward and challenges that long-dead surface-rights owner's compliance with the R.C. 5301.56(E) notice requirement ? How might the successor of the now-dead surface-rights owner meet the burden of showing that notice was properly given (or was at least attempted with reasonable diligence), and should Ohio allow a purported abandonment to be undone so many years after recorded instruments

suggest that an abandonment has occurred ?  Such an outcome might not square with the finality and certainty that the Act is presumably intended to provide.

{¶29}  In the end, those questions are not before us today, and we make no attempt to answer them now.  At this point, we hold only that Artex — which acquired Kingston Oil's underground-mineral interest in 2023 and thus became "a holder's successor[]" as that term is used in R.C. 5301.56(H) — is not barred (at least by the doctrine of standing) from challenging the validity of the Forakers' 2011 effort to acquire, through the abandonment process spelled out in R.C. 5301.56, the underground-mineral interest then held by Kingston.

{¶30}  The judgment of the Court of Common Pleas of Guernsey County is reversed, and the case is remanded for further proceedings consistent with this opinion.  Costs are to be paid by Appellees Robert and Kathleen Foraker.

By: Gormley, J.;

King, P.J. and

Popham, J. concur.